Ida M. Palmer  
vs.  } Eq. No. 2412.  
Fannie Tailer Carpenter

March 23, 1933.

FROST, J. This is a suit in equity, heard upon bill, answer, replication and proof.

The complainant seeks to compel the respondent to convey to her certain real estate situated in the City of Newport, pursuant to the terms of a contract in writing entered into by the parties hereto on or about the 20th day of June, A. D. 1932.

The respondent in her answer admits that she did affix her signature to an agreement for the sale and purchase of her real estate but asserts that at that time, by reason of a severe and serious physical and mental ailment from which she was suffering, she was incapable of comprehending and understanding the subject matter of the contract and unable to appreciate the probable consequences of signing such instrument. She also asserts that the sale price named was wholly inadequate.

The issues raised upon the pleadings are, therefore, the adequacy of the consideration named in the agreement of sale and the mental capacity of the respondent at the time of the execution of the agreement.

From the evidence in the case it appears that the respondent, Mrs. Carpenter, had placed her property, "Cliff Lawn" by name, in the hands of Newport Realty Trust Corporation to be rented or to be sold. The complainant, Mrs. Palmer, being desirous of purchasing property in Newport, on or about June 18, 1932, conferred with the Newport Realty Corporation and learned that "Cliff Lawn" was for sale. She made an offer of $10,000. At this time Mrs. Carpenter was living at the Plaza Hotel in New York City. Mr. Richard C. Adams, the Vice-President and Manager of Newport Realty Trust Corporation, went to New York and conferred with Mrs. Carpenter. He testified that Mrs. Carpenter said that she was not well and that she did not look well; that she was nervous. He told her of the offer of $10,000 and that he considered it a very low offer. They discussed the offer from many angles, the consideration to her, the disposal of furniture in the store rooms, and so forth. Mrs. Carpenter wanted to know the cost of storage and of packing. She spoke of the cost of maintaining the property, the cost of repairs, the upkeep of the grounds, the taxes. After considering what she would get out of it, Mrs. Carpenter refused the offer. Mr. Adams asked her if she would be willing to sell if she could get $10,000 net. She said then that she would accept $12,000 if he could get the offer. He did not have an offer of $12,000 at that time. Mr. Adams left and went to lunch, at which time he says Mrs. Carpenter had come to no definite conclusion. He returned after luncheon and together they went over the plan of selling at $12,000. He testified that he filled out a blank form of agreement which he read to her as he went along. Mrs. Carpenter called her attorney, Mr. Donlin, on the telephone and Mr. Adams read the contract to him. Her attorney said that the form was all right but would not advise her to sign until he had talked with her. Mr. Adams left about 3:30 P. M. and told Mrs. Carpenter if she signed the contract to mail it to him. Mr. Adams testified that Mrs. Carpenter was coherent in her talk with him; that her questions were intelligent; that she appeared to be giving consideration to the matter of price; that she discussed the commission and said that she must have at least $10,000 for herself. Mr. Adams returned to Newport and re-

ceived a call over the telephone from Mrs. Carpenter on June 21st, as he thought, in which conversation she said that she had signed the contract and mailed it. He also received a letter from her by special delivery on June 21st. After receiving the contract signed by Mrs. Carpenter in which the sale price was $12,000, Mr. Adams called Mrs. Palmer on the telephone and she came over from Jamestown, signed the contract and paid to Mr. Adams $1200.

Of the meeting with Mr. Adams at the Plaza Hotel on June 20th, Mrs. Carpenter testified that on that day her condition was much worse than it had been; that she was broken in mind, body and soul; that she never wanted to sell "Cliff Lawn" but that she was possessed of a strong urge to rid herself of all her property; that she did not blame Mr. Adams nor did she sign the contract because of his influence, but that she was dominated by the idea of ridding herself of her property; that from four o'clock on the day of the interview until two o'clock the next morning, she paced the floor; that she inserted in the contract a provision in regard to taxes and then scratched it out and then put it in again; that she wrote a letter to Mr. Adams; that she signed the contract about two o'clock in the morning (June 21st), mailed it and then tried to get it back; that she regretted her action as soon as she had dropped the letter in the box.

Mrs. Carpenter went to Newport on June 23rd. She shortly saw Mr. Harvey, her attorney, in Newport. He declined to allow his office to draw a deed conveying the property to Mrs. Palmer because of what he considered to be her condition.

Counsel for respondent do not claim that Mrs. Carpenter was of unsound mind at the time of the hearing. Indeed, Dr. Sullivan testified that when he saw her about one week after the signing of the contract her condition was abating and that she was not then of unsound mind. Counsel do contend, however, that at the time of the execution of the agreement to sell Mrs. Carpenter was not of sufficient mental capacity to comprehend and understand the subject matter of the contract which she signed and the natural and probable consequences of her signature.

Much testimony from doctors of high repute was offered to show that Mrs. Carpenter was suffering from compulsive thinking; that her acts were not free acts but compulsive acts. The position of the respondent is set forth clearly in an answer given by Dr. John E. Donley during his cross-examination by counsel for the complainant, when he said: "I think that Mrs. Carpenter, with a document before her, as the result of antecedent and simultaneous influences preying in upon her, was so upset emotionally and so dominated by compulsory thinking as to render her unfree in the sense that she did not exercise average, normal judgment and freedom of choice in signing the document." (Trans. A. to Q. 74.)

Before drawing any conclusions from the oral testimony bearing upon Mrs. Carpenter's condition and the transactions generally, which is very considerable in amount, it is necessary to give some attention to the correspondence between Mrs. Carpenter and her agents.

On March 6, 1932, Mrs. Carpenter wrote to Mr. Adams: "Please change figure on your book for rental to $3,000 or $2,500 as I am most anxious to rent it. Would sell furnished but I do not know how much to ask. What would you advise." (Postscript in same letter) "What do you think I could get for it at auction—with furniture?" (Respondent's Ex. 6.)

On April 30, 1932, Mrs. Carpenter wrote to Mr. White, a real estate agent: "Please try to rent my house 'Cliff Lawn' at Newport for one thousand dollars or fifteen hundred and tenant to take care of grounds during

occupancy. Would take any rent—So please change figures on your book * * * Would sell house for $20,000— or anything I could get for it." (Compl't's Ex. 5.)

On May 8, 1932, to Mr. Adams, after saying that she would take $7,500 in cash on a selling price of $20,000, balance on mortgage at 6 per cent. Mrs. Carpenter wrote: "I hope to return to Europe in about three or four weeks and would' like to have it arranged before—otherwise it could be done by letter—Will give you my address before I leave. * * * Am so anxious to sell or rent—as I told (?) you would take $1000 or $1200 or anything I could get." "P. S. Write me about what you think it would bring at auction—if I could not sell Private Sale—could not land be sold by foot? do (?) I have about 2 acres?" (Respondent's Exhibit 12.)

On May 30, 1932, Mrs. Carpenter wrote to Mr. Adams: "Wish it were possible to rent place if not sold—Would take any rental figure eight or nine hundred or less—Taxes and Insurance a great expense." (Respondent's Ex. 17.)

On June 12th Mrs. Carpenter wrote Mr. Adams in reference to an offer of $20,000 which was apparently lost: "Do try to get a hold of those people —Must sell the house—Will give everything in it—all antiques. Wire me as soon as there is any hope—Will take less if necessary." "P. S. Am terribly disappointed." (Respd't's Ex. 22.)

Again, on June 14th, Mrs. Carpenter wrote to Mr. Adams: "Will sell the house furnished as it is—but would like the large embroidery on drawing room wall which is framed—and the one in drawing room over sofa—but would not let those two embroideries interfere with sale. Would give them everything. Am so disappointed about the sale falling through—do try to get them back—Must sell as soon as possible—or rent. Would rather sell—do let me hear from you by return mail—

if there is any hope." (Respd't's Ex. 23.)

Again on June 16th Mrs. Carpenter wrote to Mr. Adams: "Could you not tempt the party with lower price, say ten or fifteen or eighteen thousand. Offer them the place at a lower figure if they won't pay $20,000. I must sell or rent, cannot afford running expenses of place." (Respd't's Ex. 25.)

On June 20th, referring to her agreement which she had just signed, Mrs. Carpenter wrote, "Have signed enclosed with proviso that the sales tax is not effective on that date, I hear it is ten per cent.—If she will pay that extra amount so I can clear the $12,-000, will close.—Should place be sold please arrange that I can leave contents in the three storerooms until the end of July as I want to be present when auction takes place, as I am obliged to be in N. Y. daily on account of law suit until the end of next month—" (Respd't's Ex. 27.)

On June 21st, Mrs. Carpenter wrote to Mr. Adams: "You will have to raise her to $15,000 (Fifteen Thousand) the price is so low it makes me more ill even that would not pay for furniture but I would be satisfied. * * * Please put following in agreement. She is to pay full sale tax. * * * Let me know exact amount of sale tax—am told $600—but this she is to pay. To put all above in agreement you will have to write it out fully * * * " (Respd't's Ex. 28.)

Taking up the issues raised by the pleadings, the Court will first consider the question of inadequacy of consideration.

Inadequacy of consideration in and of itself is not ground for refusing specific performance of a contract.

 *Pomeroy's Equity Jurisprudence*, 4th edit., Vol. 2, Sec. 926;

 *Michael Sweeney* vs. *George H. Brow* (1913), 35 R. I. 227 at 231.

But were it otherwise, there is no testimony in the case that would permit the Court to find that the sum of $12,-

000 cash was not a fair price at the time the agreement was executed. It is perhaps significant that the respondent offered no testimony of real estate men tending to show the fair market value of the property on June 20th, 1932. There was evidence that seven years before the property had been purchased for $18,000. There was evidence indicating that the respondent considered it to have a value far in excess of $12,000. There was also evidence from which the Court might surmise that the real estate in more normal times would have a value considerably beyond the price named in the agreement. From such testimony as did appear on the condition of the real estate market in June 1932, it would seem that the fair value of property such as is here in question was what anybody was willing to give for it. Nor, if it be assumed that the price of $12,000 was inadequate, can it be said that there were other inequitable incidents which would allow and require the Court to refuse specific performance. Mrs. Palmer dealt entirely with Mr. Adams, the agent of the respondent for the sale of the property. The respondent does not, nor do her counsel claim that Mr. Adams exerted any improper influence upon Mrs. Carpenter in the execution of the agreement. The testimony contains nothing that would permit the Court to criticize Newport Realty Trust Corporation or Mr. Adams, its Vice-President and Manager, in the entire conduct of the transaction which is the basis of this suit.

What was Mrs. Carpenter's condition mentally and physically at the time when the agreement of sale was executed?

. The age of Mrs. Carpenter is not in evidence. She appeared, however, to be a woman of mature years but in good health. She had been married twice. She testified that she had been intensely fond of her second husband but had obtained a divorce from him some years before for reasons and on grounds commonly considered sufficient and adequate. All the circumstances surrounding her divorce were such as to make it necessary for her to go abroad to rest and recover her health. She succeeded in regaining her health but in January, 1932, returned to this country because of questions that had arisen relative to alimony. After returning to this country she invested most, if not all, her money in annuities.

From all of the evidence, it seems clear to the Court that prior to June, 1932, much had come into the life of Mrs. Carpenter of a distinctly disturbing nature. Life had brought her extreme happiness and also the keenest sorrow. In the spring of 1932, she was tired and worn. She was in a highly nervous and emotional state but through it all there is ample evidence, the Court thinks, that her mind was functioning clearly and rationally and that she was caring for her own interests with no small degree of judgment and foresight. She testified that she had an urge to rid herself of her property but the fact that she converted her securities into annuities does not of itself indicate a lack of clear thinking or an inability to guard and protect her own interests.

Her letters reveal the desire to return to Europe. In Europe she had regained her health. There she would be far away from objects which served only to arouse memories of unhappy events. The letters also speak of heavy, burdensome taxes and the high cost of maintenance of her property, "Cliff Lawn".

Under all the circumstances, the desire to sell her property and thereby free herself from the burden of its care and expense, a desire which existed and manifested itself for a very appreciable period of time, does not indicate to the Court that Mrs. Carpenter was acting other than as a free and normal person. There is evidence

tending to show that Mrs. Carpenter in June reached the decision that $12,-000 for her property was worth more to her at that time than a larger sum at some later time. Nor does the fact that afterward she desired not to sell unless she could get more indicate to the Court, in and of itself, that she was acting under any compulsion when she executed the agreement.

Notwithstanding the opinions of eminent experts and of laymen in high standing, all of which opinions have been considered with care, the Court, upon all of the evidence, is clearly of the opinion that Mrs. Carpenter, at the time the agreement of sale was executed, had sufficient intelligence to understand the nature of the transaction in which she was engaged and to protect her own interests, and that she acted freely with a full knowledge of the probable consequences of her acts. *Pomeroy, supra,* Section 947.

But counsel for the respondent contend that, even though the Court find that Mrs. Carpenter was mentally competent to execute the agreement of sale, yet, since the granting of the relief prayed for is not a matter of right but lies in the sound discretion of the Court, the Court should, in view of all the circumstances of this case, decline to grant the relief requested.

It is no doubt true that specific performance is not an absolute right on the part of a complainant but it is to be exercised on equitable considerations in view of all the circumstances of the case.

*Ball* vs. *Milliken,* (1910), 31 R. I., p. 36 at p. 46.

However, while this remedy is a matter of discretion, the discretion must not be arbitrary, nor capricious, nor founded solely on sympathy, but must rest upon a consideration of all the circumstances of the case.

*Smart* vs. *Boston Wire Stitcher Co.* (1930), 50 R. I., p. 409, at 417.

In this case, in the opinion of the Court, no inadequacy of consideration has been proved; the amount of $12,-000 was considered by Mrs. Carpenter from many points of view. She was at the time in the full possession of her faculties and she was not subjected to any undue influence or improper pressure either by Mrs. Palmer or by her brokers. To deny specific performance under all the circumstances of the case would be an arbitrary exercise of the power of the Court.

Upon all the testimony the Court has reached the conclusion that. the complainant is entitled to specific performance of the agreement of sale and therefore grants the prayer of complainant contained in her bill of complaint that respondent perform the said agreement.

Attorneys for the complainant: Burdick, Corcoran & Peckham.

Attorney for the respondent: M. A. Sullivan, Esq.